Roger G. DES VERGNES et al.,
Plaintiffs, Appellants,

v.

SEEKONK WATER DISTRICT,
Defendant, Appellee.

No. 79–1085.

United States Court of Appeals,
First Circuit.

Argued May 9, 1979.

Decided June 25, 1979.

Stephen D. Clapp, North Attleboro, Mass., with whom Armstrong, Pollis & Clapp, North Attleboro, Mass., was on brief, for plaintiffs, appellants.

John J. Graham, Boston, Mass., with whom William E. Hickey, Quincy, Mass., was on brief, for defendant, appellee.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, WYZANSKI, Senior District Judge.*

WYZANSKI, Senior District Judge.

This is an appeal from the District Court's dismissal, for failure to state a cause of action, of a three-count complaint. Plaintiffs contend that their complaint, properly construed, alleges that the defendant with the intent of discriminating against low-income persons and black persons denied plaintiff Heritage's petition to have its real estate included within the Seekonk Water District thus causing damages to plaintiffs, and that such allegations state causes of action under 42 U.S.C. §§ 1981, 1983, and 1985(3) as well as the Thirteenth and Fourteenth Amendments.

Because Count III, invoking 42 U.S.C. § 1981, has the most inclusive and specific allegations, we start with the following summary of and, where necessary, quotations from that count.

Plaintiff Heritage Homes of Attleboro, Inc. is a Massachusetts corporation which owns in the town of Seekonk a parcel of land (called "the locus") abutting upon the land of Seekonk Water District. Plaintiff Roger G. Des Vergnes is president, sole stockholder, and guarantor of the notes of Heritage.

Defendant Seekonk Water District is a municipal corporation created by Mass.St. 1945, c. 381 (hereinafter "the Act"). Other defendants named in the complaint are not appellees in this court. Although the complaint does not quote, it refers to Sections 1 and 13 of the Act.

Section 1 of the Act provides that "the inhabitants of the town of Seekonk liable to taxation in said town and residing within" a specified area of the town "shall constitute a water district and are hereby made a body corporate . . . for the purpose of supplying themselves with water . . ."

Section 13 of the Act, governing possible enlargement of the District, provides:

Upon a petition in writing addressed to said board of water commissioners requesting that certain real estate, accurately described therein, located in said town and abutting on said district and not otherwise served by a public water supply be included within the limits thereof, and signed by the owners of such real estate, or a major portion of such real estate, said water commissioners shall cause a duly warned meeting of the district to be called, at which meeting the voters may vote on the question of including said real estate within the district. If a majority of the voters present and voting thereon vote in the affirmative the district clerk shall within ten days file with the town clerk of said town and with the state secretary an attested copy of said petition and vote; and thereupon said real estate shall become and be part of the district and shall be holden under this act in the same manner and to the same extent as the real estate described in section one.

In February 1976, plaintiff Des Vergnes told the Board of Water Commissioners of the District that Heritage was contemplating purchasing and developing a parcel in the town of Seekonk abutting the District, but the acquisition was dependent upon the District supplying water. The Board members stated that they had plans for including the locus in the District, that there was adequate water, and that inclusion of the locus was a mere formality. In April 1976, relying on these assurances, Heritage bought the locus and Des Vergnes guaranteed the purchase notes.

In accordance with Section 13 of the Act, Heritage addressed a petition to the Board of Water Commissioners to have its locus including within the limits of the District. Thereupon the board issued a warrant for a May 11, 1976 meeting of the voters of the District. Among the items of the warrant, # 17 called for a vote on the Heritage petition, and # 18 called for a vote on a petition of Monterey Corporation "for the inclusion within the District of a tract of

* Of the District of Massachusetts, sitting by designation.

land substantially similar to the locus in proximity, topography, and size" and "in furtherance of development plans substantially similar to those of Heritage" (Count III, par. 16, R. 14).

After the publication of the warrant, Mann, Devine and Tortolani, individual voters of the District, began telling other voting members of the District that the Heritage subdivision would consist of Federally subsidized low-income housing and/or housing consisting of shacks designed to attract low-income people and/or colored people. (Count III, par. 21, R. 53).

"The discussion which preceded the vote on Heritage's Article # 17 disclosed that as a result of the acts of the defendants Mann, Devine and Tortolani the vast majority of the voters present were unalterably motivated by a class-based invidiously discriminatory prejudice and fear concerning Federally subsidized low-income housing, shacks which were designed to attract low-income people and colored people to the town of Seekonk." (Count III, par. 25, R. 56).

"Prior to the vote taken on Article # 17 the District's agents, Olean and Benson, informed the members that the District had more than adequate supplies of water to serve both the Heritage and the Monterey subdivisions and that both of the proposed subdivisions met the criteria previously applied by the District for all other applicants." (Count III, par. 26, R. 56)

"The vote[s] of the members of the Water District on May 11, 1976, Article 17 and Article 18 were as follows:

| | | |
|---|---|---|
| Article 17 (Heritage) | No – 66 | Yes – 8 |
| Article 18 (Monterey) | No – 6 | Yes – 25" |

(Count II, par. 28, R. 56)

"The District's denial of the plaintiffs' request for inclusion was because the voting members believed that the plaintiffs would contract for the sale of houses in the subdivision to black families. The denial of inclusion was also because the plaintiffs had demonstrated in the sale of their North Attleborough property a willingness to contract with black families. The denial was for the purpose of keeping black people out of the District and punishing the plaintiffs for their willingness to contract with black people." (Count III, par. 30, R. 56)

The denial of the Heritage petition injured plaintiff Heritage by making the lots in its parcel of real estate less valuable and injured plaintiff Des Vergnes by adversely affecting his earning power and by causing him to face insolvency presumably because of his losses as an officer, stockholder, and guarantor of the notes of Heritage.

Count III ends with prayers for damages, a preliminary injunction, and a permanent injunction directing the District to extend its boundaries and water supply to include the Heritage locus.

We now consider *seriatim* (1) the correct construction of Count III, (2) whether Heritage has a constitutional standing to sue, (3) whether Heritage has a statutory standing to sue, (4) whether the District as a municipal corporation may be held liable under 42 U.S.C. § 1981, (5) whether the District's liability may be premised on a vote of the voters of the District, (6) whether Count III alleges that those voters who on May 11, 1974 voted to deny the Heritage petition had a racially discriminatory intent, and (7) whether plaintiff Des Vergnes has stated a cause of action under 42 U.S.C. § 1981.

### (1)

In considering whether Count III of the complaint states a cause of action, our first task is to construe it. We must be guided by the following precept stated in *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), a case involving a claimed violation of petitioners' constitutional rights and of 42 U.S.C. §§ 1981, 1982, and 1983:

"For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."

■ The materiality of the allegations of Count III must be governed by the fact that 42 U.S.C. § 1981, the statute invoked by that count, is concerned with racial discrimination, not with economic class discrimination or violations of civil rights which have no racial aspect.

The most material allegations of Count III are set forth in paragraph 30 already quoted. It is there averred that the District's denial of Heritage's petition was because of the District voters' belief that plaintiffs would contract to sell houses to blacks and because plaintiffs had demonstrated in the sale of North Attleborough lots a willingness to contract with blacks. It is further averred that the denial was for the purpose of keeping black people out of the District and punishing the plaintiffs for their willingness to contract with blacks.

That paragraph on first impression seems to charge that the District denied the Heritage petition because of the voters' beliefs and because of Heritage's past conduct, not because Heritage had a present intention to sell to blacks in Seekonk. However a close reading shows that the complaint does allege that the denial was in part, at least, on account of Heritage's present intention. The allegation of plaintiffs' willingness to contract with blacks is not limited to will- ingness at any particular period. The North Attleborough sales are cited as a demonstration of a continuous attitude. When this close reading is taken in conjunction with the general contours of Count III, and construing the pleadings so as to do substantial justice, Fed.R.Civ.P. 8(f), we conclude that the count sufficiently alleges that the District denied the Heritage petition not merely because of what the voters believed but because the plaintiffs in the past were willing and did sell to blacks, and because, in connection with a project currently under construction, they are willing to sell to blacks.

### (2)

■ Heritage has "standing to sue" in the constitutional dimension of that phrase. Heritage has alleged that the District by denying Heritage's petition caused it to suffer economic injury. In the words of Justice Powell in *Warth v. Seldin*, 422 U.S. 490, 517, 95 S.Ct. 2197, 2214, 45 L.Ed.2d 343 (1975), the controversy between the parties remained "viable when this complaint" was filed; defendant's denial of the Heritage petition "continued to block a then-current construction project;" and the prayer for an injunction directing the District to extend its boundaries and water supply demonstrates that there "remained a live, concrete dispute when this complaint was filed." Hence there was a "case or controversy" within the meaning of Article III. *Ibid*, pp. 498–499, 517, 95 S.Ct. pp. 2204–2205, 2215. *Village of Arlington Heights v. Metropolitan Housing D. Corp.*, 429 U.S. 252, 263, 97 S.Ct. 555, 50 L.Ed.2d 723 (1977).

### (3)

■ Heritage also has in the statutory sense standing to sue.

42 U.S.C. § 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

The text of § 1981 does not explicitly give a cause of action to Heritage inasmuch as it is "a corporation [which] has no racial identity and cannot be the direct target of . . . alleged discrimination," *Village of Arlington Heights v. Metropolitan Housing D. Corp., supra*, at p. 263, 97 S.Ct. at p. 562. But that is not the end of the matter.

After the Supreme Court in *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969) held that the parallel text of 42 U.S.C. § 1982 gave a cause of action to a white person against another who had injured the white person because he had made an assignment of property to a black, lower federal courts

held that a white person had a cause of action under § 1981 against another who injured him because he made a contract with a black, *DeMatteis v. Eastman Kodak Co.*, 511 F.2d 306, modified 520 F.2d 409 (2nd Cir. 1975), or because he protested the racially discriminatory discharge of a black, *Winston v. Lear-Siegler, Inc.*, 558 F.2d 1266 (6th Cir. 1977), or because he associated with blacks, *Faraca v. Clements*, 506 F.2d 956 (5th Cir. 1975).

Those cases stand for two propositions: to invoke § 1981 or § 1982 one need not be a member of the racial class protected by the statute and one need not even be able to identify any specific member of the class who suffered or may suffer discrimination. In *Sullivan* the court did not rely on the fact that the injured plaintiffs could point to a specific black whose right he was championing. The majority opinion of Justice Douglas, 396 U.S. p. 239, 90 S.Ct. 400, derived its *ratio decedendi* from *Barrows v. Jackson*, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953) where the defendant had been allowed successfully to invoke the Fourteenth Amendment to prevent the enforcement against him of a racially restrictive covenant despite the fact that neither he nor any specifically identified person belonged to the restricted race. The reason enunciated in *Barrows* for giving standing was that since "it would be difficult if not impossible for the persons whose rights are asserted to present their grievance before any court" (346 U.S. p. 257, 73 S.Ct. p. 1035), the defendant was "the only effective adversary," (p. 259, 73 S.Ct. 1031). In *Sullivan* (p. 237, 90 S.Ct. p. 404), Justice Douglas not only quoted that last phrase, but indicated that Sullivan himself had been "punished for trying to vindicate the rights of minorities protected by § 1982" not for protecting an identified member of the minorities protected.

■ From *Sullivan* and from cognate cases under § 1981, we conclude that, in order to effectuate the public policy embodied in § 1981, and in order to protect the *legal rights* of non-whites expressly created by § 1981, a person has an implied *right of* *action* against any other person who, with a racially discriminatory intent, interferes with his right to make contracts with non-whites. *A fortiori* a person has an implied *right of action* against any other person who, with a racially discriminatory intent, injures him because he made contracts with non-whites. Because Heritage comes within each of those two rules it has statutory standing to sue.

That conclusion is directly supported by *Park View Heights Corp. v. City of Black Jack*, 467 F.2d 1208 (8th Cir. 1972) and *Kennedy Park Homes Ass'n v. City of Lackawanna*, 436 F.2d 108, 109 (2nd Cir. 1970). Nor is there anything to the contrary in *Warth v. Seldin*, (a case where 42 U.S.C. § 1981 as well as 42 U.S.C. §§ 1982 and 1983 was invoked) or *Village of Arlington Heights v. Metropolitan Housing D. Corp.*, (which did not involve 42 U.S.C. § 1981, but only the Fourteenth Amendment) both *supra*. In neither case was there a plaintiff who had both a constitutional standing to sue and a claim of a statutory right of action under 42 U.S.C. § 1981. If there had been a plaintiff who had a live, concrete dispute, Justice Powell in *Warth v. Seldin*, 422 U.S. at p. 517, 95 S.Ct. at p. 2214 said he "possibly . . . would have had standing to seek review." Moreover, in *Village of Arlington Heights*, the court, again speaking through Justice Powell, assumed that a plaintiff which had "met the constitutional requirements" of the "case or controversy" clause of Article III of the Constitution" (429 U.S. p. 263, 97 S.Ct. 555) had the necessary standing to seek review of its Fourteenth Amendment claim and held that the plaintiff failed to prevail solely because it did not prove that the defendant acted with the necessary racially discriminatory intent. If a corporation does have a Fourteenth Amendment right of action when it is excluded for racially discriminatory reasons, the existence of such right does not, of course, automatically imply that it also had a 42 U.S.C. § 1981 right of action, but the reasoning which supports the Fourteenth Amendment right of action tends to support a 42 U.S.C. § 1981 right of action.

### (4)

There is no doubt that although it is a municipal corporation, the District may be held liable under 42 U.S.C. § 1981.

Even before *Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), overruling *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), held that municipal governments are not entitled to an absolute immunity from liability under 42 U.S.C. § 1983, the prevailing view was that municipal governments and local governmental bodies were not entitled to absolute immunity from liability under 42 U.S.C. § 1981. *Sethy v. Alameda County Water Dist.*, 545 F.2d 1157, 1159–1161 (9th Cir. 1976); *Mahone v. Waddle*, 564 F.2d 1018, 1030–1037 (3rd Cir. 1977); *Garner v. Giarrusso*, 571 F.2d 1330 (5th Cir. 1978). After the decision in *Monell*, it is incontrovertible that a water district does not enjoy an absolute immunity from liability under 42 U.S.C. § 1981

### (5)

We next consider whether the District's liability may be premised on a vote of the voters of the District.

Section 13 of Mass.St.1945, c. 381 gives to the "voters" the power to grant or deny a petition to enlarge the Seekonk Water District. Although the Act does not define the term "voters", it indisputably means legal voters of the Town of Seekonk who are "inhabitants of the town of Seekonk liable to taxation in said town and residing within the territory" of the District. Mass.St.1945, c. 381, §§ 1, 8, 9, 10, 11, 13 and 14.

When as a body the voters act upon petitions for inclusion, they are acting on behalf of both the District and the Commonwealth. That they act upon behalf of the District is indicated by the facts that they assemble at a District meeting called by the Board of Water Commissions to vote on an article in the warrant which calls the meeting and warns them that the petition will be the subject of a vote. In this aspect the voters are acting like a body of stockholders of a private corporation to which, by statute, may be given the authority to act for the corporation on major matters such as a merger or a mortgage of all the assets. That the voters act also upon behalf of the Commonwealth of Massachusetts and the Town of Seekonk is indicated by the facts that the vote is to be reported to the town clerk, and, far more important, that their vote, if favorable to a petition signed by less than all the owners of real estate proposed to be included in the District, may subject to taxation under Section 7 of the Act against their will persons not already members of the District.

In acting upon behalf of the District with respect to Section 13 petitions, the voters are not agents subject to superiors within the corporate hierarchy. In such matters the acts of the voters "may fairly be said to represent official policy." *Monell v. Department of Social Services of The City of New York, supra*, 436 U.S. at p. 694, 98 S.Ct. p. 2038. Therefore if the majority of the District voters deny a petition, the intent of that majority constitutes the official policy of the District.

### (6)

The next question is whether Count III alleges that those voters who on May 11, 1974 voted to deny the Heritage petition were racially motivated.

Paragraph 25 of Count III (like par. 23 of Count I which we consider later) alleges that the vast majority of the voters present [on May 11, 1974] were unalterably motivated by a class-based invidiously discriminatory prejudice and fear concerning Federally subsidized low-income housing, shacks which were designed to attract low-income people and colored people to the town of Seekonk.

This averment alleges both an economic and a racial bias. As *Village of Arlington Heights v. Metropolitan Housing D. Corp., supra*, 429 U.S. at pp. 265–266, 97 S.Ct. 555 reminds us, rarely is a legislature or administrative body motivated by a single purpose, and when there is proof that a discriminatory purpose has been one of the

motivating factors, there is cause for inquiry in a Fourteenth Amendment case. Here we have a body of voting citizens, not a legislature, and we have a case under 42 U.S.C. § 1981, not under the Fourteenth Amendment. But the reminder in *Arlington Heights* is relevant, and leads us to conclude that plaintiffs' complaint adequately alleges that defendant's denial was racially motivated.

If the matter were doubtful, the doubt is put at rest by paragraph 30 which alleges that "The denial was for the purpose of keeping black people out of the District."

### (7)

■ While Heritage has persuaded us that the District Court erred in dismissing as to it Count III of its complaint, the case is otherwise with respect to the individual plaintiff Des Vergnes.

"The personal insolvency of and loss of future earning power of Des Vergnes" (Count III, paragraph 33) may be indirect consequences of the denial of Heritage's petition, but such indirect consequences do not give Des Vergnes a constitutional or statutory standing to sue defendant for breach of the District's duty under § 1981. *Warth v. Seldin, supra,* 422 U.S. at p. 509, 95 S.Ct. 2197.

### (8)

We now turn to consider Heritage's Count I claim based on 42 U.S.C. § 1983, which provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws,

shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

We are mindful that in Count I there is no equivalent to the allegation in paragraph 30 of Count III upon which we relied in construing and determining the adequacy of Count III. But virtually all the other allegations are repeated.[1] There can be no doubt that Count I does allege that Heritage met the criteria applied to Monterey Corporation and all other previous applicants for inclusion in the District (Count I, par. 23, R. 46), and that the voters of the District who voted against Heritage "were unalterably motivated by a class-based invidiously discriminatory prejudice and fear concerning 'Federally subsidized, low-income housing,' 'low-income' people, and/or colored people."

Under the general standard of construction we have been admonished by *Warth v. Seldin* to follow in civil rights cases, we construe Count I as alleging that one of the reasons the District rejected the Heritage petition was because of intentional racial discrimination.

Upon the basis of that construction, we now consider whether Heritage has stated a cause of action under § 1983.

■ It does not matter that Heritage is not an individual. Corporations are persons whose rights are protected by 42 U.S.C. § 1983, *Safeguard Mutual Ins. Co. v. Miller,* 472 F.2d 732, 733 (3rd Cir. 1973); *Kennedy Park Homes Ass'n v. City of Lackawanna,* 436 F.2d 108 (2nd Cir. 1970); *Dailey and Columbia Sq. Inc. v. City of Lawton, Okl.,* 425 F.2d 1037 (10th Cir. 1970). They are also persons who, under the Fourteenth Amendment, have a constitutional right to the equal protection of the laws. *Ibid.*

---

1. Unlike paragraph 21 of Count III, paragraph 18 of Count I alleges that in their statements to other voting members of the District, Mann, Devine, and Tortolani "began intentionally and knowingly misrepresenting to other voting members of the District that the Heritage subdivision would consist of 'Federally subsidized low-income housing' and/or housing consisting of 'shacks' which were designed to attract 'low-income' people and/or 'colored' people to the town of Seekonk." We construe that ambiguous averment as not denying that plaintiffs' intent was to sell to minorities, but saying that what they would sell would be better than shacks.

Heritage has with respect to its § 1983 claim the necessary constitutional standing to sue. There is an Article III case or controversy between Heritage and the District because Heritage alleges that it has sustained an economic injury "fairly traceable to the defendant's acts or omissions." *Village of Arlington Heights v. Metropolitan Housing D. Corp., supra,* 429 U.S. at p. 261, 97 S.Ct. at p. 561.

Here our reasoning is precisely the same as it was when we considered Heritage's constitutional standing to sue on the basis of its § 1981 claim.

Heritage's statutory standing to sue on the basis of its § 1983 claim is not a perfect parallel to Heritage's statutory standing to sue on the basis of its § 1981 claim. Heritage's § 1983 claim is founded on "the deprivation of . . . [some person's] rights . . . secured by the Constitution."

"Few principles of law are more firmly stitched into our constitutional fabric than the proposition that a State must not discriminate against a person because of his race or the race of his companions, or in any way to compel or encourage racial segregation." *Adickes v. Kress & Co.,* 398 U.S. 144, 151–152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970). Therefore a State may not punish a non-white for having social contacts with a black. *Ibid.* Likewise it may not through one of its creatures, punish or discriminate against a corporation for its willingness, past or present, to make contracts with blacks. And if it does so, then the person so punished or discriminated against has a § 1983 right of action. *Crow v. Brown,* 457 F.2d 788 (5th Cir. 1972) aff'g 332 F.Supp. 382, 384 (N.D.Ga.1971); *Dailey and Columbia Sq. Inc. v. City of Lawton, Okl., supra,* at p. 1038.

For the reasons given in our discussion of § 1981, the District is not absolutely immune from an action brought against it under § 1983. *Monell v. Department of Social Services of the City of New York, supra.* If the voters, acting on behalf of the District to establish its policy, had an intent to discriminate on racial grounds against Heritage, Heritage has a § 1983 right of action against the District.

We, therefore, conclude that Heritage is entitled to a reversal of the District Court's judgment dismissing its claim under Count I. But for the same reasons his claim under Count III was inadequate, Des Vergnes' claim under Count I fails, and he is not entitled to a reversal of the District Court's judgment.

(9)

There remains for consideration plaintiffs' claim set forth in Count II. The Count II claim is bottomed on 42 U.S.C. § 1985(3) which provides:

If two or more persons in any State . . conspire . . . for the purpose of depriving, either directly on indirectly, any person . . . of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . (and) if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

That statute is addressed to conspiracies which have a class-based, invidiously discriminatory basis. *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971).

The only place in Count II where plaintiff Heritage refers to a conspiracy is paragraph 33, which reads:

The defendants Mann, Devine, and Tortolani and the District conspired against the plaintiffs because of their belief that the plaintiffs were members of, or closely allied with, or indistinguishable from a class of persons defined by invidious criteria.

In the present context of this case we need not decide whether plaintiffs have alleged a cause of action under § 1985(3), a

claim which raises difficult questions of construction as well as of standing and conspiracy law. Subsequent to the filing of this appeal, by agreement among the parties, the private defendants—Mann, Devine, and Tortolani—were dropped as defendants from the suit. Thus the chief benefit of § 1985(3) to a plaintiff, the ability it gives him to reach the conduct of private individuals and not merely state actors, is no longer pertinent to this case. The sole conspirator now a party to this case is the District, and Heritage's claim of its violation of the Fourteenth Amendment can be fully litigated and, should the plaintiff prevail, remedied under the § 1983 claims.

*Judgment as to Des Vergnes affirmed. Judgment as to Heritage Homes of Attleboro, Inc. affirmed as to Count II, but as to Counts I and III reversed and remanded for further proceedings not inconsistent with this opinion.*